```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
MARJORIE E. GILLIES, as Executrix
of the Estate of Christine Jacoby
a/k/a Christine Walck ,

                    Plaintiff,         07-CV-0517

         v.                            DECISION
                                       and ORDER
MICHAEL J. ASTRUE, Commissioner
of Social Security,

                    Defendant.
_____
```

## INTRODUCTION

Plaintiff, Marjorie E. Gillies ("Plaintiff"), as Executrix of the Estate of Christine Jacoby, a.k.a. Christine Walck ("Jacoby"), brings this action pursuant to Title II of the Social Security Act, seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying Jacoby's application for a period of disability and Disability Insurance Benefits ("DIB"). Plaintiff specifically alleges that the decision of the Administrative Law Judge, Norma Cannon ("ALJ"), that Jacoby was not disabled within the meaning of the Social Security Act, was not supported by substantial evidence in the record and was contrary to the applicable legal standards.

Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)"), on the grounds that the ALJ's decision was not supported by substantial evidence in the record, and was erroneous. The Commissioner opposes the Plaintiff's motion, and cross-moves for judgment on pleadings on the grounds that the ALJ's decision was

supported by substantial evidence in the record. For the reasons set forth below, this Court finds that the ALJ's decision was not supported by substantial evidence in the record, and that there was substantial evidence in the record to find that Jacoby was disabled within the meaning of the Act prior to March 31, 1997, the date she was last insured for DIB. Therefore, this Court grants the Plaintiff's motion for judgment on the pleadings, denies the Commissioner's motion, and remands this action to the Commissioner for calculation and payment of benefits.

## BACKGROUND

Jacoby, a college graduate and former accountant, business manager, and bookstore manager, applied for disability benefits on October 7, 2003, claiming disability since April 15, 1992, due to cognitive difficulties, brain lesions, pain, diabetes, chronic fatigue syndrome, hypertension, back surgery, and sleep disorder. (Transcript of Administrative Proceedings at 80-1, 87) (hereinafter "Tr."). Jacoby's application was initially denied on January 2, 2004, and she timely requested an administrative hearing. (Tr. at 38-41). Jacoby appeared, with counsel, before ALJ Norma Cannon at a video hearing held on June 21, 2006. (Tr. at 1235-70). A lay witness, Marjorie Gillies (the Plaintiff in this case), and a vocational expert each testified at the hearing.

In a decision dated August 16, 2006, the ALJ found that Jacoby met the insured status requirements through March 31, 1997, but was not disabled within the meaning of the Social Security Act prior to that date, and therefore was not entitled to benefits. (Tr. at 17-

27). The ALJ's decision became the final decision of the Commissioner when the Social Security Appeals Council denied further review on June 15, 2007. (Tr. at 9). Jacoby committed suicide on June 17, 2007, and the Plaintiff filed this action on behalf of her estate on August 7, 2007. (See Plaintiff's Memorandum at 1).

## DISCUSSION

### I. Jurisdiction and Scope of Review

42 U.S.C. §405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. When considering these cases, this section directs the Court to accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938). The Court's scope of review is limited to whether or not the Commissioner's findings were supported by substantial evidence in the record, and whether the Commissioner employed the proper legal standards in evaluating the plaintiff's claim. See Monger v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding a reviewing Court does not try a benefits case *de novo*). The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F.Supp. 265, 267 (S.D. Tex. 1983) (citation omitted).

The Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c), on the grounds that the ALJ's decision is not supported by substantial evidence in the record and is not in accordance with the applicable legal standards. The Commissioner claims that the ALJ's decision is supported by substantial evidence in the record and moves for judgment on the pleadings to affirm this decision.

Judgment on the pleadings may be granted under Rule 12 (c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639 (2d Cir. 1988). If, after reviewing the record, the Court is convinced that "the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief," judgment on the pleadings may be appropriate. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957). This Court finds that there is substantial evidence in the record to find that Jacoby was disabled prior to March 31, 1997, the date she was last insured for DIB. Therefore, the Plaintiff's motion for judgment on the pleadings is granted, the Commissioner's motion is denied, and the case is remanded to the Commissioner for calculation and payment of benefits.

### I. There is Substantial Evidence in the Record to find that Jacoby was Disabled Within the Meaning of the Social Security Act Prior to March 31, 1997.

In her decision, the ALJ followed the required five-step sequential analysis for evaluating Social Security disability claims. (Tr. at 19-26). The five-step evaluation requires the ALJ to consider:

(1) Whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has a severe impairment which significantly limits her physical or mental ability to do basic work activities;

(3) if the claimant suffers a severe impairment, the ALJ considers whether the claimant has an impairment which is listed in Appendix 1, Subpart P, Regulation No. 4, if so, the claimant is presumed disabled;

(4) if not, the ALJ considers whether the impairment prevents the claimant from doing past relevant work;

(5) if the claimant's impairments prevent her from doing past relevant work, if other work exists in significant numbers in the national economy that accommodate the claimant's residual functional capacity and vocational factors, the claimant is not disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

Here, the ALJ found that Jacoby: (1) had not engaged in substantial gainful activity since April 15, 1992; (2) had severe impairments including cervical degenerative disc disorder, lumbosacral stenosis, diabetes, mild obesity, and multifactional fatigue; (3) did not have an impairment, or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (4) could not perform any past relevant work; and (5) retained the residual functional capacity to perform light work with the following exertional and non-exertional limitations: only occasional postural movements, decreased range of motion in her cervical spine, only occasional overhead lifting, and she could not work in areas of vibration or around hazards such as dangerous machinery and unprotected heights. (Tr. at 19-27). The ALJ concluded that, based

on Jacoby's age (a younger individual) with a college education, past work experience, and residual functional capacity, there were jobs in significant numbers in the national economy that Jacoby could perform. (Tr. at 26). This Court finds that the ALJ's decision was not supported by substantial evidence in the record, and instead there was substantial evidence in the record to find that Jacoby was disabled prior to March 31, 1997.

A. The Post-1997 Evidence is Relevant

The Commissioner argues that post-1997 medical records cannot be used to show that the Jacoby was disabled within the meaning of the Social Security Act prior to 1997. (See Commissioner's Reply at 3-4). However, the ALJ and the Commissioner both used State agency medical reports from 2003, to support the finding that Jacoby was not disabled within the meaning of the Social Security Act prior to 1997. Just as the ALJ and Commissioner found that post-1997 medical records were relevant to Jacoby's medical condition prior to 1997, this Court finds that the post-1997 medical records are relevant to the extent they reflect the severity of Jacoby's condition prior to 1997.

The Commissioner cites Arnone v. Bowen, 882 F.2d 34 (2d Cir. 1989), to support his argument that the post-insured status evidence of Jacoby's disability is not relevant to this decision. (See Commissioner's Reply at 3). However, in Arnone, there was a 3 year lapse in medical evidence directly following the date the Plaintiff in that case was last insured for DIB. Arnone, 882 F.2d at 39. The Second Circuit specifically held in Arnone that medical

Page 6

evidence obtained before and after an applicant is insured for DIB can be used to show that the Plaintiff was disabled before the specified date, depending on the nature of the disability. Id; See also, Guzman v. Bowen, 801 F.2d 273 (7th Cir. 1986) (finding that an IQ test taken after the Plaintiff was last insured for DIB was relevant to show that he was disabled during the relevant period).

Here, Jacoby submitted medical evidence from 1985-2006, without any significant gaps. Jacoby was diagnosed with organic brain disease, based on an MRI in 2003, which, her doctors opined, explained her symptoms of cognitive dysfunction since 1991.(See Tr. at 395, 496, 356-62). In addition, post-1997 treatment evidence relating to Jacoby's severe depression, particularly evidence of hospitalizations and electroconvulsive therapy sessions, combined with the pre-1997 evidence of hospitalization for psychiatric treatment, therapy, and episodes of depression documented by her physicians, together provide a better explanation of Jacoby's long-term depressive disorder. Therefore, the post-1997 medical records, particularly those related to her mental disease and cognitive functioning, are relevant to determining whether the plaintiff was disabled within the meaning of the Social Security Act prior to 1997.

B. <u>The Medical Evidence</u>

Jacoby had a history of psychiatric hospitalization from 1965-66. (Tr. at 874). Her medical history also included surgery for spinal stenosis in 1979, and uterine fibroid removal in 1990. (Tr. at 19, 374, 435).

On October 1, 1991, she saw Dr. Phyllis M. Burgio, for low back pain and leg numbness. (Tr. at 364). An X-ray found mild low-lumbar facet arthritis. (Tr. at 373). Jacoby continued to see Dr. Burgio, through 2003, with continued complaints of pain, weak grip, weak hip, numbness, and joint inflamation of the cervical and lumbar spine. (Tr. at 364). A subsequent CT scan in 1995 found central disc herniation at C5-C6 and right-sided disc herniation at C6-C7. (Tr. at 371). Dr. Burgio concluded in 2003 that Jacoby's physical activities were limited due to chronic fatigue syndrome and her cervical and lumbar condition. (Tr. at 366).

Jacoby was also examined by neurologist Dr. Elizabeth Doherty in 1995. (Tr. at 284-6). Dr. Doherty reviewed the 1995 CT scan and found a broad based degenerative bar at C4-5 in addition to the herniation at C5-6 and C6-7. Id. Upon examination, Dr. Doherty found decreased cervical range of motion, and ankle jerks, and opined that Jacoby's complaints of arm and hand pain were related to right C6-7 radiculopathy. Id. Jacoby also saw neurologist James Teter in 1995, who noted Jacoby's right upper extremity pain and neck pain, and found bulging and herniated discs at several levels. (Tr. at 282). Dr. Teter recommended an MRI, electromyography, and nerve conduction studies. Id.

Jacoby continued to experience pain associated with cervical disc disease throughout the relevant period and after 1997. She was treated by several neurologists, pain management specialists, and physical therapists through 2005 for cervical disc herniation

and history of spinal stenosis. (See Tr. at 314-19, 377-83, 421-52, 497-504, 507-46, 549-90, 776, 1011-61).

In 1992, Jacoby was diagnosed with diabetes mellitus and was prescribed DiaBeta 2.5 mg. (Tr. at 236). She was treated for diabetic neuropathy and retinopathy after having blurred vision and parathesia of the feet. (Tr. at 236, 709). Jacoby's diabetic neuropathy and retinopathy continued, and in 2003 it was noted that she was having difficulty walking and had persistent motor dysfunction due to sensory disturbance. (Tr. at 391, 377, 432, 448, 852-60).

Jacoby also experienced chronic severe headaches which were documented beginning in 1991. (Tr. at 570, 317-319, 645-53). She was diagnosed with occipital neuralgia in 2005 after consistent complaints of head pain. (Tr. at 634).

In 1995, Jacoby was also diagnosed for chronic fatigue syndrome (CFS) by Dr. David Bell. (Tr. at 264). Dr. Bell noted her symptoms of fatigue began in 1991, worsened with exertion, and were always present. (Tr. at 262-3). She was also experiencing severe cognitive problems, balance disturbances, and unrefreshing sleep. (Tr. at 263). She reported that she slept nearly 20 hours per day until 1999. (See Tr. at 395). Between 1999 and 2000 CFS symptoms abated and, in 2000, Jacoby developed insomnia, and was diagnosed with a sleep disorder in 2002. (Tr. at 289-91, 883-90).

Several of Jacoby's physicians opined that her CFS and sleep disorders may be due to anxiety and depression. (Tr. at 290, 361, 422, 476, 783). The ALJ did not consider Jacoby's depression to be

Page 9

severe, because Jacoby had not sought long-term treatment or counseling, and the non-examining State agency physician opined that there was insufficient evidence to diagnose a psychological impairment. (Tr. at 22). However, Jacoby's mental health problems have persisted since as early as 1965.

Jacoby was first hospitalized for depression in 1965. In 1986, she saw Dr. Gupta who noted she had been taking Norpramin for her long standing problem with depression. She saw Ann Oakes, M.S.W., who referred her to psychiatrist Dr. Hayes in 1993. Dr. Hayes reported that Jacoby's depression was severe, that she experienced rapid cycling, and was actively suicidal. (Tr. at 874). He stated that she had taken Norpramin since 1985 and she had tried Zoloft prescribed by a previous psychiatrist, Dr. Panahon. Id. He prescribed Pamelor 25m.g. and continued psychotherapy. Id. Dr. Hayes increased the dosage of Pamelor during 1993 and prescribed Paxil and Thyroxine and considered electroconvulsive therapy (ECT). (Tr. at 864). He noted episodic suicidal thoughts and opined that she may be bi-polar. Id. Jacoby's other physician also noted her continued problem with depression prior to 1997. (See e.g., Tr. at 262, 247-8, 310). In 2006, Ann Oakes, who referred Jacoby to Dr. Hayes in 1993, wrote a letter stating that Jacoby had a life-long struggle with depression with periods of sporadic relief. (Tr. at 1113).

In 2001, Jacoby began seeing Louis LaBarber, Ph.D., who detailed her history of major depressive disorder and listed her prior psychiatrists, psychologists, and medications, which included

Paxil, Zoloft, Serzone, Prozac, Remeron, Wellbutrin, and Pamelor. (Tr. at 491-4). He also listed medications she tried that were not available in the United States including Manerix and Reboxitene. Id. She noted that she had episodic suicidal urges. Id. He diagnosed her with major depression, recurrent, severe; and gave her a GAF score of 45. Id. He later noted increased suspicion of bi-polar disorder. (Tr. at 480).

Jacoby's physician continuously noted the presence of major depression in addition to physical impairments through 2006. In 2004, Jacoby was admitted to Niagara Falls Memorial Medical Center and was observed to have crying spells, anxiety, depression, and suicidal thoughts. (Tr. at 622). In 2005 she received electro convulsive therapy sessions. (Tr. at 936). Dr. Kang, who administered the ECT, noted that Jacoby had tried almost every antidepressant on the market, had been severely depressed, and had become dysfunctional. (Tr. at 944).

In 2006, Jacoby was hospitalized and diagnosed with bi-polar disorder, personality disorder with histrionic features, and a GAF score of 50. (Tr. at 711-12). Later in 2006, she was hospitalized and diagnosed with schizoaffective disorder with a current GAF of 20. (Tr. at 733-4). It was noted that she had poor insight into her psychiatric condition and her judgment was impaired. Id. She was prescribed anti-psychotic medication at that time. Id.

Jacoby was also treated by psychiatric nurse practitioner (PNP) Ann Venuto in May and June 2006. In a letter to Jacoby's attorney following a June 20, 2006 session, Venuto reported that

Page 11

she diagnosed Jacoby with depressive disorder with psychotic features. She prescribed Cymbalta, Trazodone, along with counseling. (Tr. at 1115). The letter also stated that Jacoby had been unable to work since 1991 due to depression, and that she had tried most available anti-depressants with limited relief. (Tr. at 1114). The ALJ rejected the opinion of Ms. Venuto because psychiatric nurse practitioners are "not necessarily considered to be 'acceptable sources' of medical evidence . . ." (Tr. at 25). However, Social Security Ruling 06-03p provides that information from a nurse practitioner may be considered to ". . . provide insight into the severity of the [claimant's] impairment(s) and how it affects the individual's ability to function." Instead the ALJ accepted the opinion of the non-examining State agency reviewing physician who (without ever having seen the plaintiff) opined that there was insufficient evidence to diagnose a psychological impairment during the relevant time period. (Tr. at 22, 24-5).

I find, however, that the ALJ erred in failing to give Ms. Venuto's observations and conclusions more consideration in determining whether or not Jacoby suffered from a disability during the relevant time period. See Westphal v. Eastman Kodak Co., 2006 WL 17203809 (W.D.N.Y. June 21, 2006)(in cases involving psychological impairments, opinion of a medical professional who has examined the claimant face-to-face is more reliable than that of a non-examining physician). See also Monger v. Heckler, 722 F.2d 1033, 1039 fn.2 (2d Cir. 1983) (while the opinion of a nurse is not entitled to the same weight as the opinion of a treating

physician, such an opinion is "entitled to some extra consideration . . .") While the ALJ need not have given Ms. Venuto's opinion the same weight as the opinion of the non-examining, reviewing physician, the ALJ should have given Ms. Venuto's treatment report greater consideration than she did.

In addition to her other impairments, in 2003 Jacoby was diagnosed with brain lesions and demyelinating disease after an abnormal MRI. (Tr. at 496). Dr. O'Malley noted the onset of organic brain disease in 1991 when she first experienced symptoms of chronic fatigue. (Tr. at 395). Dr. O'Malley also noted concentration, attention, and memory deficits. Id. Dr. Santa Maria also opined that her cognitive difficulties were due to brain lesions. (Tr. at 361).

The ALJ relied on two State agency physician reports. (Tr. at 24-25). One State agency physician, Virginia E. Byrnes, M.D., examined Jacoby in 2003 and reviewed her medical records from 1992-1997. (Tr. at 399-406). Dr. Byrnes concluded that Jacoby could perform light work with limited climbing or vibration, and only occasional overhead reaching. Id. A non-examining State agency physician, Michael Daniels, M.D., also reviewed Jacoby's medical records and found insufficient evidence of a mental impairment. (Tr. at 407-420).

The ALJ erred in finding that Jacoby retained the residual functional capacity to perform the exertional demands of light work. The record reveals that Jacoby had persistent problems with depression for over 40 years, and her cognitive difficulties, were

later attributed to organic brain disease, which first appeared in 1991. In addition, her physical impairments, cervical disc disease, spinal stenosis, diabetes with diabetic neuropathy and retinopathy, and chronic fatigue were present in 1992, and continued through the relevant period. The medical evidence obtained before and after 1997, taken together, demonstrates the seriousness of Jacoby's impairments. Therefore, this Court finds that there is substantial evidence in the record to find that Jacoby was disabled within the meaning of the Social Security Act prior to March 31, 1997.

    C.    <u>Non-Medical Evidence</u>

The ALJ found that Jacoby had severe impairments which could reasonably be expected to cause pain, but that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. at 24). The ALJ stated that Jacoby's daily activities, including maintaining a residence by herself and taking care of her children, were consistent with light exertional tasks and that "[if] the claimant were truly as limited or disabled as she has alleged, she would likely be unable to do even the activities she has described in evidence". <u>Id</u>. In doing so, the ALJ imposed a standard of disability upon Jacoby equivalent to being an invalid, a standard which is not justified by the regulations and case law. A claimant need not be an invalid in order to be considered disabled within the meaning of the Act. <u>See</u> <u>Vertigan v. Halter</u>, 260 F.3d 1044,

1050 (9th Cir. 2001); See also Walston v. Gardner, 381 F.2d 580, 586 (6th Cir. 1967).

Jacoby testified that she stopped work in 1992 because she had severe depression, chronic fatigue, and diabetes. (Tr. at 1240). She stated that during the relevant period, 1992-1997, she spent most of her time in bed. (Tr. at 1241). She saw psychiatrists and counselors during this period and took several anti-depressants. (Tr. at 1241-2). She stated that she could lift about ten pounds, but that Marjorie Gillies, who shared her home, did most of her shopping and cooking. (Tr. a 1244). She could do light cleaning. (Tr. at 1245). She could only walk for short periods of time and could not stand for more than five minutes without getting dizzy or experiencing severe fatigue. (Tr. at 1246, 1251). Jacoby also testified that she experienced severe pain due to diabetic neuropathy. (Tr. at 1246). The pain was in her feet, and was worse if her glucose was not controlled. Id.

Plaintiff Marjorie Gillies, a retired public school teacher, testified that she knew Jacoby since April 1972, and had lived with her since 1974. (Tr. at 1259). Plaintiff testified that Jacoby's daily activities were as follows: "she functioned minimally at home. Mostly she was sleeping a good deal of the time sometimes 20 out of 24 hours...I took care of the children during that time when I was home and when they were home from school and I did a fair amount of the cooking and cleaning and all of the outside work and a lot of repair work in the house. [Jacoby] was unable to make most of the phone calls especially personal phone calls were very

difficult for her." (Tr. at 1260). She also testified that Jacoby did little cooking. Plaintiff then described Jacoby's loss of cognitive ability, stating, "[She] in the very early years, managed all of the financial arrangements at our house. And it got to the point where she couldn't figure out a check in the restaurant...she didn't balance the checkbooks...she gradually got [sic] more and more difficultly concentrating on tasks." (Tr. at 1261). Finally, Plaintiff testified that there was no question in her mind that Jacoby "...could [not] have worked at a job on any kind of sustained and predictable basis during those years (between 1992 and 1997)." (Tr. at 1262).

Although not a medical professional, the testimony of Marjorie Gillies is relevant and supports Jacoby's testimony concerning her limitations. Social Security Ruling 06-03p requires all relevant evidence, including non-medical opinions, to be considered when evaluating a disability claim. The ruling provides that when considering the testimony of a non-medical witness, it is "appropriate to consider such factors as the nature and extent of the [witness'] relationship [to the claimant], whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." Plaintiff resided with the claimant, and observed her on a day-to-day basis. She cared for the children and did housekeeping chores. Plaintiff also substantiates Jacoby's testimony that she was suffering from a debilitating depressive disorder that precluded her from being able to maintain gainful employment. Plaintiff observed all of this

first hand, and over a significant period of time. For these reasons, Plaintiff's testimony is credible, carries weight, and should have been considered by the ALJ. Thus, the ALJ erred in disregarding the testimony of Marjorie Gillies which clearly supported the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms.

This Court finds that Jacoby's testimony, and the testimony of Plaintiff, Marjorie Gillies, are consistent with the medical evidence in the record. Yet, the ALJ found that "much of the evidence appears to indicate she has worsened over time, and that more recent limitations do not necessarily relate back to her functioning prior to 1997." (Tr. at 24). However, the record is replete with medical evidence that her more recent limitations did relate back to the medical problems from which she suffered between 1992 and 1997, which is consistent with the testimony of both Jacoby and Marjorie Gillies. Therefore, this Court finds that there is substantial evidence in the record, including the medical evidence from Jacoby's treating physicians, Jacoby's testimony and Plaintiff's testimony, to find that Jacoby was disabled within the meaning of the Social Security Act, prior to March 31, 1997.

## **CONCLUSION**

For the reasons set forth above, this Court finds that the Commissioner's decision to deny the Plaintiff benefits was not supported by substantial evidence in the record. Therefore, I grant the Plaintiff's motion for judgment on the pleadings, and the

Commissioner's motion is denied.  This case is remanded to the Commissioner for calculation and payment of benefits.

**ALL OF THE ABOVE IS SO ORDERED.**


                                              s/Michael A. Telesca
                                               MICHAEL A. TELESCA
                                     United States District Judge

Dated:    Rochester, New York
           April 29, 2009